In re Haun.

(No. 773477—Decided December 14, 1971.)

Probate Court of Cuyahoga County, Division of Common Pleas Court.

*Mr. Frank M. Gorman*, for Julie Haun.
*Mr. Albert E. Fowerbaugh*, for Children's Services.

TALTY, J. Exclusive jurisdiction of adoption proceedings is vested in the probate courts of the state. R. C. 3107.02; *In re Biddle*, 168 Ohio St. 206.

This proceeding was commenced on September 3, 1971, by the filing of a petition by Charles Haun and his wife (petitioners) seeking a decree of adoption of Julie (sometimes called Sheila) an infant of three years.

The petition has been opposed by Children's Services, a community supported child welfare agency in Cleveland certified by the state of Ohio pursuant to R. C. 5103.03, and a "certified organization" as that term is used in R. C. 3107. Children's Services has custody of the child by

reason of a permanent surrender executed by the child's mother on April 20, 1970.

At the threshold of the proceedings Children's Services moved to dismiss the petition, the sole ground for the motion being that the court lacks jurisdiction to proceed because of the provision in R. C. 3107.06, that consent of a certified organization having permanent custody of a child is a condition precedent to any adoption; that Children's Services has withheld its consent in this instance. The essential language of R. C. 3107.06 reads thus: "No final decree or order of adoption shall be entered by the Probate Court unless there is filed with the court written consent to the adoption verified or acknowledged by the following; * * * (D) by any division, county department or board, certified organization, or a person having permanent custody of the child."

The full impact of the contention urged in the motion of Children's Services is that in the absence of consent by Children's Services, however its decision to withhold consent be arrived at, the court is helpless to exercise its primary and plenary powers to grant or deny an application for adoption, or indeed to conduct hearings pursuant to a petition for adoption.

This cause is unique so far as reported decisions in this state are concerned. We must therefore plow new ground. Arguments on the motion of Children's Services made at the outset of the proceedings were couched in terms of jurisdiction of the court. It was urged that upon withholding of consent, however motivated, an impenetrable road block existed to the court's proceeding further. My opinion is that such finality was not intended by law. Since the early days of this state the adoption process has inhered in the courts of the state which are rightfully regarded by the people as the ultimate repositories of justice. It is the view of this court that the law neither invites nor contemplates frustration of the adoption process by the withholding of consent on the part of an individual, or an agency whether public or semi-public. Adoption proceedings are highly personal and frequently involve property interests, and it is in our courts that personal liberties and

property rights are vindicated and adjudicated. Proceedings of such a vast import to children, comprehending the child's health and future well being, must not be permitted to grind to a halt under circumstances where an administrative act, the filing of a written consent, may have been improperly withheld.

The facts and statutes involved in *Young* v. *Smith* (Supreme Court of Tennessee, June 23, 1950), 191 Tenn. 25, 231 S. W. 2d 365, are sufficiently close to those in this proceeding that the holding therein becomes persuasive. There a married couple sought to adopt a child of tender years. The child's father had filed an answer consenting to the child's adoption. The mother refused consent, and demurred to the petition for adoption on the ground that the Tennessee Public Acts provided that there could be no legal adoption of a child without written consent of both parents, that such consent was necessary to give the court jurisdiction. The trial court sustained the demurrer and petitioners were allowed an appeal to the Supreme Court of Tennessee, the one assignment of error being that the trial court erred in sustaining the demurrer.

Section 2 of the Tennessee Adoption Code granted various courts of that state, including probate courts, jurisdiction to authorize the adoption of children. Section 4 reads as follows:

"Be it further enacted, That before a minor child is adopted, valid written consent must be given to such adoptions, either

"(1) By both parents (if living), or by the surviving parent, of a legitimate, or legitimated child, or

"(2) By the mother of an illegitimate child, or

"(3) By the legal or natural guardian of the person of said child, if both parents are dead, incapacitated or have abandoned the child and cannot be located, or

"(4) By a licensed or chartered child-placing agency which, either under the laws of this state or pursuant to the orders of a court committing said child to said agency, has authority to place said child and to consent to the adoption of said child, or

"(5) By the department, or its agents, or by an agency

which has legally accepted guardianship and control of the child on valid release and surrender.

"Where the child to be adopted is twelve years of age, or over, the consent of such child shall be given privately in chambers."

The holding of the Supreme Court of Tennessee and its rationale are expressed in the following extracts from the court's opinion:

"While the Act provides that a 'valid written consent must be given to such adoptions * * * by both parents (if living), or by the surviving parent,' nevertheless when it conclusively appears that both parents are before the court either voluntarily or by personal service of a valid process, as in the instant case, the court is fully authorized to determine what is for the best interest of the child. The purpose of Section 4 and Subsections thereto was to give reasonable notice of the proceedings to all parties in interest to appear and show cause, if any, why the child should not be adopted. The refusal of the natural parents to give their consent, or the refusal of a mother of an illegitimate child to consent, or the objection of 'a licensed or chartered child-placing agency' to the child's adoption merely raises an issue as to the welfare of the child. When all parties in interest are before the court consent or the lack of consent to the adoption, while jurisdictional, is not determinative of the court's authority.

"* * * We think it was not the intention of the Legislature that the present and future life of a child should be left to the arbitrary will and possible caprice of anybody, be it the natural parent or any child-caring agency.

"* * * Upon full consideration of the authorities we sustain the assignments of error and remand the case to the trial court to hear proof and determine the right of the petitioners to adopt the child * * *."

It is the spirit of the law to maintain the paramount authority of the courts in the protection of private rights. I think it clear that our courts must have power to examine action or non-action of individuals or agencies if the efficacy of the courts in the area of adoption proceedings is

to be maintained. Stated in another way, individual or agency action or non-action should not be permitted to defeat the ends and aims of the adoption process.

On these premises, all parties in interest being before the court, the court decided to conduct a full hearing on the petition for adoption which included considerable testimony and evidence bearing on the decision of Children's Services to withhold its consent to adoption of the child by the petitioners. Following receipt of the evidence, oral arguments were heard and briefs of counsel received.

The facts adduced by the parties at the hearing are not contrary in any material respects.

Petitioners, Charles Haun and his wife, are 68 and 55 years old, respectively, and are in excellent health. They have resided in their Olmsted Falls, Ohio, home, valued at twenty-eight thousand dollars for twenty-two years, and in the course of their married life have had four children, one adopted, and have, upon arrangement started in 1959 with Children's Services, been foster parents of thirty-four children of whom Julie, now aged three, is one. Mr. Haun, retired, receives a Railroad Retirement pension from the Federal Government of four hundred ninety-two dollars per month. This pension will continue to be paid Mrs. Haun in the event of the prior decease of her husband. The family homestead is unencumbered and the Hauns have cash savings of twenty-one thousand six hundred dollars of which sixteen hundred dollars was banked between February 4 and October 7, 1971, attesting to the thrift and financial sagacity of petitioners. Insurance in a modest sum is paid up. Petitioners have no long term obligations.

Julie, born December 4, 1968, has been continuously in the Haun home, except for short periods of hospitalization, since she was fifteen days old. Premature at birth, Julie was legally placed by Children's Services with petitioners in their home because of their previously demonstrated expertise in the care of premature babies. Julie's mother was in labor sixteen hours and it was suspected that the child suffered some brain damage although "at the

time they couldn't know how serious." As to Julie's condition at the time she came to the petitioners, Mrs. Haun testified as follows: " * * * right that very same day she came, I noticed she couldn't lift her head. At two weeks old, she couldn't pull her arms up and she couldn't pull her legs up when she wanted to. I had to do this for her, I had to turn her head and pull her arms and legs up. *. * * and I would turn her over from time to time. * * * This went on till, oh, she was about 8 or 9 months old. * * * I was very worried about her that she couldn't do like she should do and I kept calling the clinic and asking for an appointment to see our doctor."

In due time the child was examined at the Child Neurology Clinic, University Hospitals of Cleveland, and a report rendered to which reference will be made hereinafter.

Until about a year ago Julie was slow in achieving normal accomplishments such as crawling and pushing. Although a child is customarily left by Children's Services with foster parents not more than six months, rather than risk regression from the steady progress manifested, Julie by concord of the Hauns and Children's Services was allowed to remain with the Hauns. Presently Julie is happily characterized as a normal healthy child having an IQ of 112. Without doubt the improvement over somewhat cloudy beginnings is due to the care, affection, attention and love accorded by petitioners. In turn love and affection are exhibited by Julie toward the Hauns. On this all are agreed.

This productive, continuing placement found by this court to be exceptionally beneficial to the child, has been put in jeopardy for the future by the threatened withdrawal of Julie from the care and home of petitioners.

Significantly, although petitioners have been foster parents of a large number of children Julie is the only foster child they have sought to adopt. The reasons underlying this selective action are perhaps best expressed in Mrs. Haun's words: "There was something special about Sheila from the very first, when she first came to our home, there was just something about her that we just fell in

love with. When all these problems came up we just poured out all our love and we began to love her more and more and we felt that this was a child that really needed us."

The question of adoption was first raised by the Hauns with a Children's Services case worker in the Spring of 1971. Following a negative reaction from the case worker as well as Children's executive director founded solely on the age of petitioners, these proceedings were initiated by petitioners.

In terms of placement of children, Children's Services first concern is the need of the specific child, emotional, physical, and otherwise. When considering the acceptability of an adoption couple, Children's Services looks for (1) maturity, (2) stability, (3) financial ability to carry additional responsibility, and (4) love of children. These factors or standards were found to be met by petitioners except that Children's Services urges that physical and emotional stability diminish as age increases, and that the second factor, stability, may not be present during the later years of Julie's minority. To the court this is a matter of conjecture. But certainly the evidence is clear that presently, and at least for the near term, and probably for the entire intervening period until the child's maturity, the factor of stability, in addition to the other stated factors, is satisfied by petitioners.

Inasmuch as petitioners are not being disqualified as adopting parents, we must now examine the needs, the best interest and welfare of the child. That the best interest of the child is the criterion guiding a court in approving or denying an adoption is plain from the decisions of our courts. See for example, *In re Adoption of Baker* (Court of Appeals, Cuyahoga County, September 6, 1962), 117 Ohio App. 26.

The best interests of Julie are inextricably interwoven with her special needs in view of her physical history. This case differs from the bulk of adoption proceedings because of the child's medical background and the lurking hazard of regression. Medical guidance is most cogent in determining the child's needs. Fortunately the medical guid-

ance available to us is both unambiguous and meaningful.

Among the exhibits is a memorandum of October 4, 1971, addressed to whom it may concern from the physician in charge of the Child Neurology Clinic, University Hospitals of Cleveland, who is also an assistant professor of neurology and pediatrics and the consultant to the Children's Services staff physician in this case. The full text of the memorandum is a follows:

"Sheila Smith was seen in the Child Neurology Clinic on numerous occasions in the past year and one half. During this time there was some question in regard to her neurological development. At all times we felt that adequate stimulation and a good home environment were vitally important. Her medical observers, including myself, were very impressed with the excellent care and interest shown by her foster mother Mrs. Haun. It is my opinion that the child's satisfactory development has to a large extent been a credit to the care she received in this home. While it is not in our power to wish to dictate any policy to the agency, we would respectfully submit that continuation of the care received from Mrs. Haun would be highly desirable for this delightful child. This opinion is based on our contact and the progress we observed."

The court is moved especially by the language— "* * * we would respectfully submit that continuation of the care received from Mrs. Haun would be highly desirable for this delightful child." This neurologist while talking to Mrs. Haun who had conferred with him regarding the proposal to remove the child from the Haun home to quote Mrs. Haun's testimony "said he didn't understand what they were trying to do and that all of the time he was on the case he refused to allow her to be removed." The opinion of the neurologist supports another previously expressed opinion (September 1, 1971) of a physician attached to the Nourse Clinic of Children's Services. This physician, Mrs. Haun testifies, "* * * just threw up his hands in the air and he said 'what the hell is the matter with those people downtown, don't they know that they can't move this baby?'" To run counter to such medical

opinions would constitute reckless disregard of the child's best interest and future welfare.

These professional judgments are unrebutted and in the opinion of the court are to be accorded maximum weight and cogency. To the court they are practically conclusive —they clinch the case for petitioners.

Children's Services would move Julie from the care of the Hauns to new parents yet to be chosen. The testimony of Children's Services is that skill is required on the part of case workers in helping foster families to have a successful and uncomplicated move, that skill and patience are needed in working with the family to enable them to understand the child, "to hold their hand while they are being adjusted to each other." The supervisor of the adoption service likened a move of a child to a new home to a marriage "* * * people have some rough edges to work out." It is apparent to the court that in this case if skill and patience fail, as they do all too frequently, Julie's future well being becomes speculative in contrast to the certain stability and peace obtaining should her environment remain as at present. The credible evidence is that placement of this child with individuals other than petitioners invites risk of subjecting her to grave and permanent harm. The risk is uncalled for and unnecessary in these circumstances; it is vital that the present stance be maintained.

The position of Children's Services evidenced by withholding of consent in this case does not have its source in the facts and professional judgments available to it and the court. The court discerns no justification for withholding consent nor warrant for an order other than one granting the petition.

A final decree of adoption will be entered. Accordingly, counsel for petitioners is directed to prepare a judgment entry.

The court is this day filing its separate findings of fact and conclusions of law as requested by the parties.

The court makes the following separate findings of fact and conclusions of law:

*Findings of Fact*

1. The child who is the subject of this proceeding was born on December 4, 1968. The child was legally placed by Children's Services in the home of the petitioners on December 19, 1968, on a foster home basis. She was placed directly from the hospital where she was born and has been in the Haun home since that time except for brief periods of hospitalization. She was born prematurely and subsequently developed a variety of physical symptoms and indicated generally slow development to a degree that brain damage or disease was thought possible. This condition prevented her from being placed for adoption.

2. In April and May, 1971, the child was approved for adoption by the medical doctors and psychologists employed by Children's Services. They found that at that time she had developed to a normal or better than normal condition for her age. No evidence of any brain damage or disease was found and she is now adoptable from a medical point of view.

3. Prior to April and May of 1971 she was not available for adoption by anyone.

4. The petitioners filed their petition on September 3, 1971. The child was in their home pursuant to an agreement between themselves and Children's Services. The agreement dated December 19, 1968, related to this specific child and provided for the petitioners to serve as foster parents to the child and set forth a rate of compensation, including payment for medical and clothing expenses for the child. The petitioners have a licensed foster home and have been licensed since 1959. This child is the 32nd of 34 foster children they have had in their home.

5. Mr. Haun is now 68 and Mrs. Haun is 55 years of age. They have three grown children of their own by natural birth and one child they have adopted, presently 16 years of age, who lives with them. The petitioners have an income of four hundred ninety-two dollars per month. They own their own home, free and clear of any mortgage, and have bank accounts and investments of twenty-one thousand six hundred dollars. They have no long term

obligations. Between February 4 and October 7, 1971, they accumulated savings of sixteen hundred dollars. Mr. Haun is retired. Children's Services pays them $2.50 per day for the care of the child plus defraying medical, clothing and certain other expenses of the child. The Hauns have been excellent foster parents to this child; however, they have never formally applied to Children's Services to adopt this child. The Hauns were aware that the child was placed with them in a foster home capacity and that Children's Services intended at some point when the child's development warranted it, to place the child for purposes of adoption.

6. Although the Hauns approached a case worker about adopting the child in the Spring of 1971, the request was not submitted to anyone else by the case worker until August.

7. Children's Services is a private community-supported child welfare agency located in the city of Cleveland. It is certified by the state of Ohio pursuant to R. C. 5103.03 and as such it falls within the definition of the term "certified organization" used in R. C. 3107.01 (c) and used throughout R. C. Chapter 3107, and particularly in R. C. 3107.06 (d). Children's Services has the permanent custody of the child who is the subject matter of this action by virtue of a valid permanent surrender executed by the natural mother of the child on April 20, 1970. The mother executed the surrender in her capacity as the sole parent and natural guardian of the child, in accordance with R. C. 5103.15. Children's Services has not consented to the adoption of this child by the petitioners.

8. All necessary parties to this proceeding are voluntarily before the court.

9. Children's Services filed a written motion to dismiss the petition on the grounds that the court lacked jurisdiction because Children's Services has not given its written consent to the adoption.

10. Children's Services when considering the acceptability of adopting parents first concerns itself with the needs of the specific child and then looks for (1) ma-

turity, (2) stability, (3) financial ability to carry responsibility, and (4) love of child. The evidence is clear that these factors or standards are satisfied by petitioners.

11. The unrebutted opinions of Children's Services medical consultants are that there is a clear danger that the child's present healthy physical condition could regress to the impaired physical condition which prevailed at the time she was placed in the home of the petitioners.

12. The placement in the home of petitioners is found by this court to be beneficial to the child.

13. The move from petitioners home to the care of persons yet unknown is fraught with unnecessary hazard.

14. The best interest and future welfare of the child lie with her remaining with petitioners.

*Conclusions of Law*

1. The court has jurisdiction of the parties and the subject matter; venue is proper.

2. The motion to dismiss filed by Children's Services is overruled.

3. Exclusive jurisdiction of adoption proceedings is vested in the Probate Courts of Ohio.

In the exercise of that jurisdiction the court must determine what is in the best interest of the child. Refusal of consent to an adoption by an individual or agency does not deprive the court of jurisdiction but raises the issue of the best interest and welfare of the child.

4. Since the best interests of the child lie with her remaining with petitioners the court should grant the petition for adoption.

5. A final decree of adoption may be entered.