LILLARD STINES *et al.*, Plaintiffs-Appellants, Cross-Appellees, *v.* INFANT VAUGHN *et al.*, Defendants-Appellees, Cross-Appellants.

(No. 12328; ▮▮▮▮▮▮▮▮▮▮▮▮▮

Fourth District—September 19, 1974.

*Rehearing denied December 18, 1974.*

Kenneth J. Meyers, of Dukes, O'Rourke, Stewart & Meyers, Ltd., of Danville (John P. O'Rourke and John F. Martin, of counsel), for appellants.

William J. Scott, Attorney General, of Chicago (Michael B. Weinstein and John D. Whitenack, Assistant Attorneys General, of counsel), for appellee Richard S. Laymon.

No appearance for appellee Gene Hughes.

Mr. JUSTICE CRAVEN delivered the opinion of the court:

The circuit court of Vermilion County denied the petition of Lillard Stines and Lorraine Stines to adopt Danny Vaughn. They appeal and the defendants-appellees attempt a cross-appeal from certain findings contained in the final order. The court filed a memorandum opinion that

was incorporated in the final order and found (1) the refusal of the chief probation officer and the Department of Children and Family Services to consent to the adoption by petitioners of Danny was arbitrary and capricious; (2) that the petitioners were proper persons to adopt Danny; and (3) that notwithstanding the above, and in view of the fact that Danny had not resided with petitioners for approximately 4½ years, it would not be in the best interests of the child to grant the petition for adoption. The petitioners appeal from the trial court's denial of their petition for adoption. The respondents attempt to appeal from findings (1) and (2) of the memorandum opinion; as to these matters, we find they are not final and appealable, therefore, respondents' cross-appeal is dismissed.

The salient facts giving rise to this appeal are as follows. The petitioners filed an application with the Vermilion County probation office for consideration as prospective adoptive parents. On May 4, 1965, Danny Vaughn was born. His natural mother notified the probation office that she wished to place the child for adoption. The proper consent and surrender was secured from the natural mother. The petitioners were informed on May 9, by a Miss Blanche Hamilton, an agent of the probation office handling the child's case, that a baby boy was available for them to adopt. Petitioners and their natural daughter, Karen, went to the hospital and picked up the infant. The Stineses were accompanied home by Miss Hamilton. The following day, Miss Hamilton returned to the petitioners' home with Mr. Hughes, the chief probation officer.

On May 11, a petition was filed praying that the court find the infant in question a dependent child and grant to Hughes as chief probation officer custody and guardianship with the authority to consent to adoption. On May 12, Hughes officially turned the child over to petitioners for adoption. The May 11 petition was granted and the child was declared dependent on June 17, 1965. The petitioners filed a formal petition for adoption on October 18, 1965, and on that date the natural mother filed her written consent and surrender for adoption and entry of appearance.

After the Stineses gained physical custody of the child, the probation office maintained minimal contact with the petitioners and the infant. Other than the two initial home visits made by representatives of the probation office, the record discloses that the probation office only came into contact with the infant on two other occasions. Both of these occurred when Mrs. Stines brought the child to the probation office. Even respondents admit in their brief that the scope and thoroughness of the office's preliminary investigation left much to be desired considering the sensitive nature of an adoption. The record also establishes

that the probation office follow-up investigations as required by statute were patently inadequate.

While the intentions of the probation office were uncertain, those of the Stineses' were definite and clear. Once the child was in their home, he was immediately integrated into the family unit. The record reveals that Mr. and Mrs. Stines treated Danny in a fashion commensurate with the treatment they accorded their own natural daughter Karen. The Stineses even reimbursed the probation office for the medical expenses incurred as the result of Danny's birth. The petitioners were the sole means of Danny's support.

In December 1967, the petitioners began to care for another child, Mary Ann Osborne. She was 3 years old at that time. The petitioners acted pursuant to the request of the parents and grandparents of the child. The child's parents were having marital difficulties and could not properly care for her. Petitioners secured a foster home license from the Department of Children and Family Services. This license was issued after their home was inspected and found to be suitable. After receiving the license, agents of the Department frequently visited the petitioners' home.

During the time petitioners had physical custody of Danny, Mrs. Stines was extremely active in community service organizations. She also attended Danville Junior College. In no instance does the record establish that either Danny or Mary Ann was neglected as a consequence of her activities. For example, on September 26, 1968, Yolande Brooks, an agent of the Department, which had assumed the legal guardianship of Mary Ann, called upon Mrs. Stines at the Danville Junior College in order to discuss Mary Ann's well-being. Brooks visited the Junior College nursery and observed both Mary Ann and Danny. She noticed nothing unusual about either child and found them adequately clothed and fed.

It is uncontroverted that during 1968 Mrs. Stines began to experience anxieties that manifested themselves in slightly erratic conduct. On October 9, 1968, Mrs. Stines was admitted to the Peoria State Hospital by Mr. Stines upon the recommendation of the Danville Mental Health Clinic and the Stineses' minister. Mrs. Stines remained at the hospital for 10 days and was then discharged. The Danville Mental Health Clinic informed the Department of Children and Family Services that Mrs. Stines had been hospitalized, and pursuant to this notification, Brooks and her supervisor, Margaret Cunningham, conferred with Hughes and Judge James Robinson concerning the status of Mary Ann and Danny. Hughes purportedly instructed Cunningham to take physical custody of Danny when the Department picked up Mary Ann. Hughes

also filed a motion to change custody and guardianship of Danny from the probation office to the Department of Children and Family Services. The motion was subsequently allowed. The Stineses were not given notice of the change of custody.

On the morning of October 10, 1968, Mr. Stines was informed by the Department of Children and Family Services that he must surrender the children at the court house that very afternoon, which he did. According to Mr. Stines, he was told by one of the Department representatives that he would be informed where the children were to be taken. He never was.

As pointed out in the trial court's memorandum opinion, "No inquiry was made by the Department as to the reason for the hospitalization of Mrs. Stines and no attempt was made to ascertain whether the children could be properly cared for by Mr. Stines during Mrs. Stines' absence." The trial court further observed that neither the Department nor the probation office exerted any real effort in attempting to ascertain the extent of Mrs. Stines' infirmity. After Mrs. Stines was released from the hospital, the Department informed the petitioners that they would not be able to regain custody of the children. Later in the course of this litigation, Cunningham testified that "I said as far as I was concerned, anyone who had been mentally ill I would not recommend for adoption, * * *." Moreover, she noted that when removing Danny from the Stineses' home, it would not make any difference to her what Mrs. Stines' eventual condition was going to be. We note with irony that this statement was made in the context of the fact that Danny had been residing with the petitioners for approximately 3 years and both Cunningham and Brooks testified that a child should not be removed from one home to another except for compelling reasons.

Both children were placed in a temporary foster home on October 10, 1968, and Danny remained there until June 20, 1969. During January of 1969, the Stineses again contacted the Department in order to see if they could regain custody of Danny, but to no avail. Mrs. Stines' psychiatrist wrote Cunningham advising that in his opinion Mrs. Stines should be allowed to be an adoptive parent. He stated that "any alleged mistreatment of the children staying with her occurred during her illness and is entirely contrary to her normal character." Notwithstanding this letter, the Department persisted in its refusal to reunite the petitioners with Danny.

On June 30, 1969, Danny was placed for adoption in another home and adoption proceedings were commenced; however, those proceedings have been suspended pending the outcome of this litigation. On July 10, 1969, the petitioners filed a motion to set aside the change of custody

and to return physical custody to them. Accompanying that motion was a motion to amend the petition for adoption and to stay further proceedings. On September 2, 1969, after a hearing on the motion, Judge Robinson denied the motion to set aside the change of custody on the grounds that the petitioners were not entitled to notice of the original proceedings to change custody, from one agency to another, or notice of the hearing thereon. The court also denied their motion to stay proceedings. The court did permit the Stineses to file an amended petition for adoption which was duly filed on September 23, 1969.

Judge Robinson disqualified himself from the cause and on January 5, 1970, the case was assigned to Judge Wright. After considerable delay, numerous pleadings and changes of personnel in the State's attorney's office, a hearing on the petition for adoption was held on December 10, 11, 1970, and January 14, 1971. Additional testimony was taken on September 7, 8 and 19, 1972. Judge Wright filed his memorandum opinion on April 3, 1973, and his final order was filed on April 16, 1973.

Respondents contend that the trial court did not have jurisdiction to consider the Stineses' adoption petition, for the petition was allegedly deficient in that the appropriate agency refused to consent to the adoption of the infant Vaughn. It is submitted that since adoption is a creature of statute and in derogation of common law, the Adoption Act must be strictly construed. Respondents urge that all the allegations required by the statute must appear on the face of the adoption petition in order to vest the trial court with jurisdiction. One of these necessary allegations is that either the natural parents or the appropriate adopting agency consent to the adoption. If consent to the adoption is not present, respondents argue that the trial court lacked jurisdiction because this requirement is jurisdictional.

■■ In *In re Estate of Wolfner*, 44 Ill.App.2d 77, 194 N.E.2d 1, the court discussed the validity of an adoption petition which failed to allege on its face that the natural mother had consented to the adoption of her child. The court noted that an adoption proceedings is statutory and jurisdiction of the subject matter and of the person is a prerequisite to the validity of a decree of adoption. The court ruled that even if a jurisdictional fact is not alleged in the petition, the proceedings are not null and void if that fact appears elsewhere in the proceedings. The establishment of this jurisdictional fact, sometime during the course of the proceedings, amounted to substantial compliance with the essentials of the Adoption Act. It is evident that this interpretation of the Adoption Act is not contrary to the General Assembly's legislative intent.

■■ We accept the reasoning of the *Wolfner* court and find that the substantial compliance is sufficient. The fact that petitioners' petition

for adoption in this case failed to allege that the appropriate agency consented to the adoption of infant Vaughn did not deprive the trial court of its jurisdiction.

Respondents next suggest that since consent or a statutorily sanctioned excuse thereof is mandatory, it cannot be waived by the trial court. Thus, even under the substantial compliance rationale, the agency must ultimately consent to the adoption. Essentially, the import of respondents' argument is that an adoption agency can deprive a court of its jurisdiction to review a petition for adoption by refusing to give its consent.

The language of the Adoption Act (Ill. Rev. Stat. 1971, ch. 4, ¶ 9.1-1 et seq.) relevant herein is found in sections 5, 8 and 15. Section 5 states in part:

> "B. A petition to adopt a child other than a related child shall state:
>
> * * *
>
> (j) That the person or agency, having authority to consent under Section 8 of this Act, has consented, or has indicated willingness to consent, to the adoption of the child by the petitioners, or that the person having authority to consent is an unfit person and the ground therefor, or that no consent is required under paragraph (f) of Section 8 of this Act; * * *." (Ill. Rev. Stat. 1971, ch. 4 ¶ 9.1-5B (j).)

Section 8 states in part:

> "Except as hereinafter provided in this Section, consents shall be required in all cases, unless the person whose consent would otherwise be required shall be found by the court to be an unfit person as defined in Section 1 of this Act. Where consents are required in the case of an adoption of a child, the consents of the following persons shall be sufficient:
>
> * * *
>
> (c) An Agency, if the child has been surrendered for adoption to such agency; or.
>
> (d) Any person or agency having legal custody of a child by court order if the parental rights of the parents have been judicially terminated, and the court having jurisdiction of the guardianship of the child has authorized the consent to the adoption; * * *." (Ill. Rev. Stat. 1971, ch. 4, ¶ 9.1-8 (c) (d).)

Section 15 of the Adoption Act states:

> "The welfare of the child shall be the *prime consideration* in all adoption proceedings." (Ill. Rev. Stat. 1971, ch. 4, ¶ 9.1-15.) (Emphasis supplied.)

We note parenthetically that since this cause has been adjudicated below, the General Assembly has amended the Adoption Act and reinforced the public policy enunciated in section 15 by stating in section 20(a):

"The best interests and welfare of the person to be adopted shall be of *paramount consideration* in the construction and interpretation of this Act." (Ill. Rev. Stat. 1973, ch. 4, ¶ 9.1-20a.) (Emphasis supplied.)

This section underscores the sound and prudent public policy that has always been the bedrock of the Adoption Act.

Respondents cite *Greco v. Chicago Foundlings Home*, 38 Ill.2d 289, 230 N.E.2d 865, as being dispositive of this issue. Respondents assert that the court in *Greco* held that consent is a statutory requisite to adoption. The court stated, "The statute provides that a child does not become available until the agency to which it has been surrendered gives its consent." However, the statement just cited was not germane to the narrow holding of the court. In fact, the court unequivocally declined to examine the propriety of the agency's alleged arbitrary and capricious refusal to consent, finding that issue irrelevant. The court stated, "It is unnecessary to a decision in this case to pursue this line of inquiry." (38 Ill.2d at 293.) In making this statement, the court was aware that the purpose of the petition therein was not a request for adoption but rather a habeas corpus action brought by foster parents for the sole legal purpose of reacquiring custody of their foster child.

The case at bar is not a habeas corpus action but an adoption proceeding. The purpose of this petition is not to simply reacquire physical custody, but rather to determine the permanent de facto and de jure custody. The critical issue in a habeas corpus action is whether the petitioner can show a prima facie legal right to custody. In an adoption proceeding, the issues are exceedingly broader. Whereas the supreme court in *Greco* refused to examine the consequences of an agency's failure to consent to an adoption proceeding, we must.

In *In re Haun*, 31 Ohio App.2d 63, 286 N.E.2d 478, the court interpreted the Ohio adoption statute, that is virtually identical to our Adoption Act, in the context of a case that is factually similar to this case. Therein the petitioners who were foster parents petitioned for the adoption of a 3-year-old child. The Children Services which had permanent custody of the child opposed the petition and refused to grant consent to the adoption. At the outset of the proceedings, the agency filed a motion to dismiss. The grounds for the motion was that the trial court lacked jurisdiction to proceed because section 3107.06 of the Ohio Revised Code mandated that consent of a certified agency,

having permanent custody of the child, is a condition precedent to any adoption, and that this consent was not forthcoming (see Ohio Rev. Code 1969, §§ 3107.03 and 3107.06). The trial court ruled that exclusive jurisdiction of adoption proceedings reside in the judiciary and the law never envisaged nor contemplated frustration of the adoption process by withholding of consent on the part of an individual or an agency whether public or semi-public. *In re Haun,* 58 Ohio Op.2d 336, 277 N.E. 2d 258.

On appeal, the appellate court affirmed the trial court. It stated:

"The trial court had held that the refusal of consent, apparently without more, raised the question of the best interests of the child for adjudication. We find it unnecessary to go so far to support the trial court's decision. It is enough, in our view, to simply subject the withholding of agency consent to judicial scrutiny to determine whether the agency is acting unreasonably, arbitrarily, or capriciously." (286 N.E.2d 478, 480.)

The court then addressed the issue of whether agency consent is mandatory and jurisdictional under the statute. The court found that:

"* * * [T]he requirement of agency consent was not intended by the legislature to give an unnatural parent an arbitrary, unreasonable or capricious power to defeat judicial review and, coincidentally, impede, in a specific case as in this instance, the objectives of securing qualified adoptive parents and promoting the best interests of a child available for adoption. Moreover, we find that refusal of consent even when it is not arbitrary, unreasonable or capricious does not deprive the Probate Division, Common Pleas Court, of jurisdiction. To the degree that it is reasonable, it does add an element for consideration in the probate court's determination of the qualification of the adoptive parents and the best interests of the child." (286 N.E.2d 478, 481.)

We find the reasoning of the *Haun* court persuasive. Also see *State ex rel. Portage County Welfare Dept. v. Summers,* 38 Ohio St.2d 144, 311 N.E.2d 6, wherein the Ohio Supreme Court essentially adopted the reasoning found in *Haun.* The court held that the requirement of the adoption statute that makes consent mandatory cannot operate to divest the trial court of its jurisdiction to fully hear and determine an adoption proceeding.

The record herein establishes that the Adoption Act was substantially complied with when the trial court explored the reasonableness of the agency's refusal in determining what would serve the best interests of the child involved. The trial court was aware of the technical defect in the petition, concerning the lack of agency consent. The court inquired

into the circumstances surrounding the agency's refusal to consent and strived to determine the reasonableness thereof. It made specific findings dealing with this matter and found that the agency had acted unreasonably. The thrust of the trial court's finding was that this entire litigation resulted directly from the abject failure of respondents to appreciate the sensitive nature of their duties and responsibilities. We must agree.

We also reject respondents' contention that an agency can deprive a court of its jurisdiction to review an adoption petition by merely refusing to give its consent. To accept this contention would circumvent the legitimate ends of the Adoption Act.

Lastly, petitioners urge that the trial court's denial of their petition for adoption was an abuse of discretion and against the manifest weight of the evidence. The petitioners are correct when asserting that the standard for review in cases such as the one at bar is whether the findings of the trial court were contrary to the manifest weight of the evidence. *Townsend v. Curtis*, 15 Ill.App.3d 209, 303 N.E.2d 566.

When the trial court reviews facts in making its final determination, the welfare of the child should be the prime consideration in all adoption proceedings. (*In re Petition to Adopt Cech*, 8 Ill.App.3d 642, 291 N.E.2d 21.) In this case, since the natural parents are not contestants, the welfare of the child was the trial court's only concern.

■■ The determining fact the trial court relied upon in denying the petition was that Danny had been separated from petitioners for over 4½ years. He had established a new lifestyle with his present foster parents, and looked upon them as his natural parents. The court found that Danny's memories and recollections of his stay in petitioners' home were extremely vague. The court took specific note of testimony given by Dr. Eisen, a clinical psychologist, who contended that Danny was beginning to make adjustments to his present home situation although the adjustments were marginal. Dr. Eisen indicated that a removal from his current environment would abort any positive adjustments and could result in severe emotional disturbance. The trial court's memorandum opinion points out that because of the favorable adjustment in his present foster home and the length of time that he had been out of petitioners' home, it was the opinion of the court that it would not serve Danny's best interests to grant the adoption petition. Upon this record, the trial court's ruling was not against the manifest weight of the evidence. Accordingly, the judgment must be and is affirmed.

Judgment affirmed.

SMITH, P. J., and TRAPP, J., concur.