HAROLD K. *et al.*, Petitioners-Appellees, v. RYAN B. *et al.*, Respondents-Appellants (William B. *et al.*, Counterpetitioners-Appellants; Ryan B. *et al.*, Counterrespondents-Appellees).

Fifth District    No. 5—99—0028

Opinion filed May 12, 2000.

David M. Fahrenkamp, of Edwardsville, for appellants W.B. and K.B.

Roza Gossage, of Belleville, for appellees H.K. and D.K.

Deborah Crouse Cobb, of Crouse Cobb & Bays, of Edwardsville, for R.B.

JUSTICE KUEHN delivered the opinion of the court:

Eight-year-old Ryan B. was the subject of two competing petitions for adoption. William B. and Kathy B., Ryan B.'s biological paternal uncle and aunt, appeal the trial court's December 9, 1998, judgment of adoption in favor of Harold K. and Dawn K. We vacate the visitation portion of the judgment and otherwise affirm.

## CHRONOLOGICAL FACTS

Teresa By. and Darryl B. never married but had four children—Jessica, now 12, Nicole, now 10, Ryan, now 8, and Miranda, now 6. There is a fifth child, named Jennifer, but the record does not contain much information about her. We believe that Teresa By. is Jennifer's mother, but even that detail may not be correct, and we know nothing about her biological father. We are also unclear as to Jennifer's living arrangements but believe that she resides with a grandparent. In this order, when we refer to the girls, we are referring to Jessica, Nicole, and Miranda only.

Not much is contained within the record regarding Darryl B. except that he has a long history of drug and alcohol abuse. The briefs indicate that the last time he saw any of his children was in May 1995. There is a July 1995 Missouri child abuse/neglect report indicating that Teresa By. dropped Ryan B. and the three girls off at Darryl B.'s motel room without his knowledge while Darryl B. was out drinking. Whether or not Darryl B. saw the children before the Missouri Division of Family Services stepped in on that occasion is not known. All parties involved unanimously agree that he was not much of a father.

Teresa By. does have some interest in her children but seems to simply have been overwhelmed by her situation. She also has a long history of drug and alcohol abuse. She lived with her children in Missouri, where there were several child abuse/neglect investigations. Teresa By.'s typical pattern involved leaving her children in the care of a babysitter or landlord and then not returning for days. Oftentimes she left without informing anyone that she was leaving, and in those cases, the landlord was not immediately aware that she had been placed in charge of Teresa By.'s children. Not all of the reports were substantiated, and some involved only Nicole and Miranda.

Ryan B. and the three girls remained together until late in 1995. In November of that year, Teresa By. left all four children at a babysitter's home and then disappeared. When she resurfaced four days later, she admitted having spent the time "drinking and partying." The following month, she disappeared for a week. When interviewed by the Missouri Division of Family Services representative, Teresa By. indicated that she had just lost her job and that it was time to place the children in foster care as she simply could not take care of them. Teresa By. stated that her father would not allow Teresa By. and the children to live with him, and Teresa By. was not interested in moving into a shelter until alternate arrangements could be made. Later, Teresa By. confessed to the babysitter that she had a new boyfriend and that she did not want to "sabotage" this new relationship.

Teresa By.'s brother and his wife, Dennis By. and Lisa By., offered to take the four children into their home. They did so in December 1995 without financial assistance. In February 1996, Lisa By. needed to return to work and could not afford the day care needed for Teresa By.'s children in addition to her own two. Therefore, she asked Teresa By. to come and take her children back. She came and got the children. In March 1996, the problems began again, and Teresa By. brought two of the children back to Dennis By. and Lisa By.—Jessica and Ryan B. Ryan B. never actually stayed with the Bys. this time but went to stay with Lisa By.'s brother and his wife, Geoffrey C. and Linda C. Although Teresa By. had never met the Cs. and while they

were not blood relatives, she had no problem with Ryan B. going to live with them. Teresa By. kept Nicole and Miranda. In April 1996, Teresa By. began leaving Nicole and Miranda in the care of her landlord and disappearing. Although the date is difficult to read, it appears that on April 30, 1996, with Teresa By.'s full consent, the Madison County circuit court granted guardianship of Jessica to Dennis By. and Lisa By. and granted guardianship of Ryan B. to Geoffrey C. and Linda C. On May 3, 1996, Nicole and Miranda were taken into Missouri protective custody and placed in a foster home. By May 10, 1996, William B. and Kathy B. expressed an interest in taking their nieces, Nicole and Miranda, into their home as foster parents. On June 10, 1996, a Missouri court granted William B. and Kathy B. physical custody of Nicole and Miranda. In August 1996, Linda C. contacted the Missouri Division of Family Services to advise that they could no longer care for Ryan B. due to his extreme misbehavior. In late August 1996, Ryan B. was taken in by Linda C.'s cousin and her husband, Dawn K. and Harold K. Later that year, in September, Lisa By. began experiencing some health problems and called Darryl B.'s brother and his wife, William B. and Kathy B., about taking over the care of Jessica. In early September 1996, Jessica joined her two younger sisters and began living at the home of her uncle and aunt, William B. and Kathy B. On September 16, 1996, the trial court terminated the Bys.' guardianship of Jessica.

The Cs. and the Ks. did not contact Teresa By. or Darryl B. to inform them that Ryan B. had come to live with the Ks. at their Glen Carbon home. At that time, the Ks. did not know how to contact either parent. On November 2, 1996, after William B. and Kathy B. contacted the Cs. regarding Ryan B.'s whereabouts, the Cs. contacted the Ks., and the Ks. called the Bs. back that same night. More phone calls took place that month, and the Ks. attended the girls' baptisms over in Missouri.

The Ks. claim that, during this family gathering, they laid out their plans to adopt Ryan B. and that the Bs. advised that their plate was simply "too full" with respect to children. The Bs. claim that they arrived at an absolute agreement with the Ks. that the Ks. would turn Ryan B. over to them by the beginning of 1997. A November 1996 letter from Kathy B. to Dawn K. details that the truth was somewhere in the middle. In the letter, the Bs. clearly ask the Ks. to contemplate Ryan B.'s best interests—not the Ks.' own best interests. In other words, it could definitely be inferred that the Bs. were aware of the Ks.' plans to adopt Ryan B. but were asking them to really consider Ryan B.'s welfare before acting upon their desires. The letter makes no mention of an agreement to turn Ryan B. over on a date certain.

The Ks. filed their petition to adopt Ryan B. on December 5, 1996, and amended it on December 10, 1996. The petition specifically listed Ryan B., his biological mother and father, and the Cs. (who still were his legal guardians) as respondents. On February 26, 1997, William B. and Kathy B. intervened. The Bs. filed their own petition to adopt Ryan B. on May 6, 1997, and the two matters were consolidated. On May 20, 1997, Darryl B. consented to Ryan B.'s adoption by his brother and sister-in-law only (William B. and Kathy B.).

Beginning in November 1996, Ryan B. began visiting with his three sisters over at the Bs. or at more neutral locations. Visitation was unstructured and sporadic. At some point, the Ks. were told by their attorney and/or by Ryan B.'s court-appointed guardian *ad litem* that, due to jurisdictional concerns, Ryan B. should not engage in subsequent out-of-state visitation. Ultimately, on November 20, 1997, the court intervened and ordered regular visitation.

The case was tried on May 5 and 7, 1998, June 2, 1998, and August 18, 1998. On June 3, 1998, Teresa By. filed her irrevocable consent for Ryan B.'s adoption by the Bs. only. At trial, Ryan B.'s counselor, Dr. Linda Cassens, testified that Ryan B. was extremely bonded with the Ks. and considered them his family. She also testified that based upon her observations and communication with Ryan B., Ryan B.'s best interests would be served by granting the Ks.' adoption petition. Ryan B.'s guardian *ad litem* filed her report, in which she expressed similar opinions. She recommended that the Ks. be allowed to adopt Ryan B. She believed that Ryan B. should still see his three sisters on a regular basis. Because of the animosity that the Bs.—especially William B.— displayed towards the Ks., the guardian felt that Ryan B. stood a far greater chance of continued visitation with his three sisters if he was adopted by the Ks. than any chance of continued visitation with the Ks. and his older "brother" Joey (the Ks.' natural son), should the Bs.' petition be granted. On September 24, 1998, the trial court granted the Ks.' petition for adoption, thereby denying the Bs.' petition. This order also contained an order for visitation so that Ryan B. would still see his three sisters and other biological relatives. Several orders were entered on December 9, 1998, specifically, an order denying the Bs.' motion for relief from the order of adoption, one terminating the parental rights of Darryl B. and Teresa By., and one entering the court's judgment of adoption.

## KS.' BACKGROUND

The Ks. live in Glen Carbon. One child was born during their marriage—Joey. Joey was 12 when the trial court entered the order of adoption. They reside in a three-bedroom home, along with a dog and

a cat. Harold K. is a truck dispatcher and Dawn K. works in various educational capacities for a school district, and so her schedule mirrors that of her children. Annual household income at the time of the adoption was $46,000. Ryan B. could have his own bedroom but chooses to room with Joey. Both biological parents oppose the Ks.' adoption plans.

## BS.' BACKGROUND

The Bs. live in St. Charles County, Missouri. Two boys were born during their marriage. Ryan B.'s three biological sisters reside in their household. At the time of the adoption, these five children ranged in age from 4 to 10. The family resides in a three-bedroom home. William B. is a truck driver and Kathy B. is a stay-at-home mother. Annual household income at the time of the adoption was $41,652. Ryan B. shares a bedroom with his two male cousins when visiting. Both biological parents approve of the Bs.' adoption interests.

## STANDARD OF REVIEW

■ The standard of review in adoption proceedings is whether or not the trial court's findings were contrary to the manifest weight of the evidence. See *Stines v. Vaughn*, 23 Ill. App. 3d 511, 519, 319 N.E.2d 561, 567 (1974).

■ The standard of review relative to the admission of expert witness testimony is whether or not the trial court abused its discretion. See *Illinois Health Care Ass'n v. Wright*, 268 Ill. App. 3d 988, 997, 645 N.E.2d 1370, 1376 (1994).

## LAW AND ANALYSIS

■ *Opinion of Linda Cassens, Ph.D.* Dr. Cassens testified on behalf of the Ks. At the time of Dr. Cassens' testimony, Ryan B. was undergoing counseling sessions with her. Dr. Cassens' methods with such a young patient involve observing the child at play and asking questions when appropriate. In using these methods, she learned much about Ryan B.'s situation and developed certain opinions.

The Bs. argue that the trial court erred in allowing her opinion testimony because she did not follow the American Psychological Association guidelines for custody evaluations and custody recommendations. The Ks. agree that she did not follow those guidelines, but they contend that the guidelines were simply not relevant to the testimony she did give—as Ryan B.'s treating counselor.

We carefully reviewed the transcript of Dr. Cassens' testimony and agree with the Ks.' position. Dr. Cassens insisted that she was not trying to express an opinion in an evaluation capacity. She admitted that much more would have been required to fully express a custody

opinion, and she stated that she was not being asked to do so. She was merely expressing her opinions regarding Ryan B.'s continued welfare in her capacity as Ryan B.'s counselor. She provided specific situations during Ryan B.'s play activities that led to her conclusion that he felt horribly torn during his visitations with the Bs. and that he was completely bonded with the Ks., viewing Dawn K. and Harold K. as his mom and dad and Joey as his brother. She also learned and informed the court that Ryan B. felt differently about his Uncle William B. and that these feelings sometimes involved fear. Dr. Cassens clearly explained the bases of her opinions. Those opinions were subjected to vigorous cross-examination. We conclude that, given the clearly stated context of these opinions, the trial court did not err by allowing Dr. Cassens to state her opinions.

■ *Ks.' Alleged Misconduct.* The Bs. contend that the Ks. committed misconduct in obtaining and retaining Ryan B. and that the trial court should have counted such misconduct against them when making its adoption determination.

The problems the Bs. experienced in locating Ryan B. seem to begin and end with the Cs. The Cs., not biological relatives of Ryan B., maintained legal guardianship of Ryan B. *with mother Teresa By.'s express permission.* The Cs. could not handle the continued guardianship of Ryan B. Linda C. and Dawn K. are close relatives. Dawn K. and her husband Harold K. volunteered to take Ryan B. at that time. Dawn K. and Harold K. had no independent knowledge of Ryan B.'s biological parents.

In an effort to ascertain Ryan B.'s whereabouts, the Bs. contacted the attorney who prepared the guardianship papers on behalf of the Bys. and the Cs. We do not know what he did or did not tell the Bs., and we do not know if the attorney even knew who the Ks. were. The attorney owed no duty of disclosure to the Bs., due to his attorney-client relationship with the Bys. and the Cs.

The Bs. knew that the Cs. maintained legal guardianship of Ryan B. The record contains the Bs.' claim that, by November 1996, they had been trying for six months to arrange visits with Ryan B. Analyzing this claim, we conclude that the Bs. must have had trouble with the Bys. as well as the Cs.—the two families hand-picked by mother Teresa By. to care for her son. When the Bs. finally called the Cs. in early November 1996, the Cs. immediately called the Ks., and that same night, the Ks. contacted the Bs. That night, the Ks. set up the first get-together for Ryan B. and the three girls.

If the Ks. were as vindictive and purposeful as the Bs. contend, their acts in setting up this event were certainly inconsistent with those motives. Contact with the Bs. was established just longer than

two months after Ryan B. went to live with the Ks. Three months after Ryan B. began living with the Ks., the Ks. petitioned for his adoption. Once the petition was filed, efforts to contact and serve both biological parents were made, as is necessary pursuant to Illinois law.

After reviewing all of this evidence, we fail to see the improper intent. The Ks. took Ryan B. into their home with the plan to adopt him. They pursued this course shortly after he became a part of their family. Perhaps in a perfect world, the Ks. should have attempted to ascertain the identity of the Bs. in order to facilitate earlier visits. When visits began, only a little more than two months had elapsed. The Ks.' actions simply do not amount to "stealing" Ryan B. away.

The case cited by the Bs., *In re Petition of Kirchner*, 164 Ill. 2d 468, 649 N.E.2d 324 (1995), is inapposite. The petitioners in that case misled the court and were subsequently denied standing to adopt. See *Petition of Kirchner*, 164 Ill. 2d at 493-94, 649 N.E.2d at 336. No one here misled the court.

Accordingly, we find no basis to conclude that the trial court's order of adoption in some way rewards the Ks. for their "misconduct." We find no misconduct.

*Adoption of Ryan B.* The Bs. argue that the trial court's order of adoption should be overturned because the court improperly awarded visitation. As we deal with the visitation order separately, we briefly address the remainder of the court's order of adoption.

No one disputes that Ryan B. was eligible for adoption (see 750 ILCS 50/3 (West 1994)) or contends that the Ks. were individuals ineligible to adopt pursuant to Illinois statute (see 750 ILCS 50/2 (West 1994)). Jurisdiction and venue are proper. See 750 ILCS 50/4 (West 1994). No one disputes that Darryl B. and Teresa By. are unfit parents, as the trial court concluded.

■ In an adoption setting, the trial court must base its decision "on the welfare and best interest of the child." 750 ILCS 50/15.1(c) (West 1994). A child's best interest "is and must remain inviolate and impregnable from all other factors."[1] *In re Ashley K.*, 212 Ill. App. 3d 849, 879, 571 N.E.2d 905, 923 (1991); see also 750 ILCS 50/20a (West 1994). The factors the trial court must consider include the following:

"(1) the wishes of the child;

(2) the interaction and interrelationship of the child with the applicant to adopt the child;

(3) the child's need for stability and continuity of relationship with parent figures;

---

[1]*In re Ashley K.*, 212 Ill. App. 3d 849, 571 N.E.2d 905 (1991), involves an appeal of a custody award. Although the setting is different, the definition of the best-interests-of-the-child standard remains the same.

(4) the wishes of the child's parent as expressed in writing prior to that parent's execution of a consent or surrender for adoption;

(5) the child's adjustment to his present home, school[,] and community;

(6) the mental and physical health of all individuals involved;

(7) the family ties between the child and the applicant to adopt the child and the value of preserving family ties between the child and the child's relatives, including siblings;

(8) the background, *** age[,] and living arrangements of the applicant to adopt the child; [and]

(9) the criminal background check report." 750 ILCS 50/15.1(b) (West 1994).

■ If the Ks. or the Bs. wanted to adopt Ryan B., without the competition of the other, there would be no doubt that either family is ideal. Unfortunately, the trial court was faced with having to make a decision choosing one family over the other. The trial court carefully weighed the above-referenced factors, keeping the best interests of Ryan B. paramount, and concluded that Ryan B. would be, on balance, better off with the Ks. In reviewing the extensive record and considering the briefs and arguments of the parties, we find no basis to conclude that the trial court's determination is contrary to the manifest weight of the evidence.

Ryan B.'s clearly stated preference is to remain with the Ks. He desires continued interaction with his biological relatives, but only for short periods of time. Much testimony was taken indicating that Ryan B. considered Dawn K. and Harold K. his "parents." Ryan B. has clearly bonded with the Ks. In terms of stability and continuity of relationship, Ryan B. is best served staying where he has been now for in excess of three years. He has adapted well in his home with the Ks. and in the Edwardsville school system. After reviewing the record, we are compelled to conclude, as the guardian *ad litem* and the trial court did, that Ryan B. needs continued contact with both families and that, if he was adopted by the Bs., his contact with the Ks. would certainly end. Ryan B. would suffer irreparable harm if permanently removed from the lives of the Ks. Finally, the size relative to the economic status of the families is an important consideration. The families' income levels are virtually identical, but on the same amount of income, the Bs. have to support four children more than the Ks. Additionally, with that many children, the time spent with each child would most likely be proportionally diminished.

Accordingly, the trial court's decision to allow the Ks.' petition to adopt Ryan B. is in Ryan B.'s best interests and was appropriately granted.

*Order of Visitation.* The trial court entered an order of visitation at the time that it entered the order of adoption, providing for mandated visits between Ryan B. and his biological family. The idea was a worthy one. Everyone, except the Bs., agrees that it is important for Ryan B. to maintain contact with all relevant parties. However, we conclude that the visitation portion of the order is void due to a lack of subject matter jurisdiction.

■ Subject matter jurisdiction refers to the court's power to decide the general question involved, as well as the power to grant the particular relief requested. See *In re M.M.*, 156 Ill. 2d 53, 64, 619 N.E.2d 702, 709 (1993). Once an unrelated adoption takes place, the child's previous ties are completely severed. See *In re M.M.*, 156 Ill. 2d at 73, 619 N.E.2d at 713. For all practical and legal purposes, the child's biological relationships end. The child becomes the legal child of the adoptive parents. Decisions and control over the adopted child's life are turned over to the adoptive parents. In an unrelated adoption, there simply is no authority for visitation with the child's biological family. And if the trial court orders such visitation, there is, consequently, no way to enforce the order.

■ The trial court's order of continued postadoption visitation with Ryan B.'s biological family is simply without legal authority. The trial court lacks subject matter jurisdiction to enter such an order. Accordingly, the visitation order must be vacated.

In reaching this decision, we feel that it must be emphasized that we are not suggesting that Ryan B.'s need to interact with his biological family is any less important than it was in December 1998 when the trial court entered its order. We hope that all involved parties will continue to do what is in Ryan B.'s best interests and voluntarily promote continued interaction between the two families on a regular basis. Ryan B. deserves no less.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Madison County is affirmed in part. Pursuant to Supreme Court Rule 366(a)(5) (155 Ill. 2d R. 366(a)(5)), that portion of the trial court's September 24, 1998, order of adoption and December 9, 1998, judgment of adoption requiring ongoing visitation with Ryan B.'s biological family is hereby vacated.

Affirmed in part and vacated in part.

HOPKINS and MAAG, JJ., concur.